**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| WILLIAM CAMARA, | : | |
| on behalf of himself and all | : | |
| others similarly situated, | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:07-cv-1914 (JCH) |
| | : | |
| METRO-NORTH | : | |
| RAILROAD COMPANY, | : | JANUARY 29, 2009 |
| Defendant. | : | |

**RULING RE: CROSS MOTIONS FOR SUMMARY JUDGMENT (Doc. Nos. 20 & 42),**
**PLAINTIFF'S MOTION FOR LEAVE TO FILE (Doc. No. 55),**
**AND DEFENDANT'S MOTION FOR LEAVE TO FILE (Doc. No. 56)**

## I.    INTRODUCTION

The named plaintiff, William Camara, brings this action against defendant Metro-North Railroad Company ("Metro-North") on behalf of himself and all others similarly situated.  Camara has been employed by Metro-North since 1984, most recently as a radio maintainer.  He is currently 51 years old and resides in Orange, Connecticut. Metro-North is a public benefit corporation organized under the laws of New York, and a subsidiary of the Metropolitan Transportation Authority ("MTA").  It is engaged in the operation of passenger rail lines in Connecticut and New York.

This court has certified a class pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, with Camara as the class representative.  The class is defined as all Metro-North employees whose jobs involve the use of a valid driver's license and who have worked at the company from 2004 through the present, excluding

those employees who hold a commercial driver's license ("CDL").[1]  See Order Re: Plaintiff's Motion to Certify Class (Doc. No. 15).

The plaintiff employees assert that Metro-North has violated the Driver's Privacy Protection Act, 18 U.S.C. § 2721, et seq. ("DPPA"), by improperly obtaining and using their personal information from motor vehicle records maintained by various state departments of motor vehicles ("DMVs").  Metro-North contends that it does not obtain or use any personal information from the DMVs, and that if it does, it is entitled to obtain and use such information because it is a government agency.

Both the plaintiffs and Metro-North have moved for summary judgment.  Further, the plaintiffs have moved for leave to file a sur-reply brief, and Metro-North has moved for leave to file a sur-sur-reply brief.  Both Motions for Leave to File (Doc. Nos. 55 & 56) are **GRANTED**.  For the reasons that follow, Metro-North's Motion for Summary Judgment (Doc. No. 42) is also **GRANTED**.  Accordingly, plaintiff's Motion for Summary Judgment (Doc. No. 20) is **DENIED** as moot.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the

---

[1]CDL-holders are excluded from the class because the Driver's Privacy Protection Act, 18 U.S.C. § 2721, et seq., contains a clause explicitly allowing employers to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49 of the United States Code (49 U.S.C. § 31301, et seq.).  See 18 U.S.C. § 2721(b)(9).

nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

Generally, when assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.   BACKGROUND[2]

Metro-North is a public benefit corporation and a wholly owned subsidiary of the Metropolitan Transportation Authority ("MTA"). See Affidavit of Richard K. Bernard, Vice President and General Counsel for Metro-North ("Bernard Affidavit"), at ¶ 4. It was created in September 1982 to operate commuter rail service between New York City and communities in Westchester, Dutchess, Putnam, Orange, and Rockland Counties in New York, and Fairfield and New Haven Counties in Connecticut. See id. at ¶¶ 3-4. As a public benefit subsidiary corporation of the MTA, Metro-North has all the

---

[2]For the purposes of the instant motion, the court accepts facts undisputed by the parties and supported by evidence as true, and resolves disputed facts in favor of the party against whom the motion under consideration is made. The underlying facts in this case are, for the most part, not in dispute. Rather, the parties vigorously contest the legal significance of those facts.

privileges, immunities, and exemptions of the MTA, except the power to contract

indebtedness.  See id. at ¶ 8.  The Legislature of New York has declared that in

carrying out its purpose – namely, the continuance, further development, and

improvement of commuter transportation and related services – the MTA is performing

an essential governmental function for the benefit of the people of the State of New

York.  See id at ¶ 6; see also N.Y. Pub. Auth. L. § 1264(1) & (2).

As of September 1, 2008, Metro-North employed approximately 1,375 non-CDL

driving employees.  See Affidavit of David A. Bownas, Metro-North Deputy Director of

Human Resources ("Bownas Affidavit") at ¶ 3.  These individuals operate either

personal or company vehicles during the course of their employment with Metro-North.

See id.  It is essential to the operation of Metro-North that its driving employees operate

vehicles in order to perform their duties at, and along, the railroad right of way.  See id.

at ¶ 4.  Examples of work ordinarily and regularly performed by Metro-North's driving

employees include, inter alia, track and signal maintenance, bridge and track

inspections, and electrical work on overhead wires.  See id.  Of Metro-North's

approximately 1,375 driving employees, 980 hold New York driver's licenses, 343 hold

Connecticut driver's licenses, 44 hold New Jersey driver's licenses, and eight hold

licenses from other states.  See id. at ¶ 3.

Since 2004, Metro-North has periodically requested its driving employees' driver

histories[3] from state DMVs.  See Plaintiff's Local Rule 56(a)(1) Statement ("Pltff's

---

[3]State DMVs refer to these records as either driver histories, driving histories, or driver abstracts. As the record contains no evidence of any substantive difference between these, the court uses the terms interchangeably.

56(a)(1) Stmt.") at ¶ 9.  It does so either directly or through a third party vendor.  Id.

Metro-North requests the vast majority of these abstracts from the New York,

Connecticut, and New Jersey DMVs.  See Defendant's Local Rule 56(a)(1) Statement

("Dft's 56(a)(1) Stmt.") at ¶ 10.

For example, in November 2007, Metro-North submitted a State of Connecticut

Department of Motor Vehicles Form J-23, titled "Copy of Records Request," to the

Connecticut DMV.  See Bownas Affidavit at ¶ 18.  The form sought driving histories for

107 Metro-North employees who held non-CDL Connecticut diver's licenses.  As an

attachment to the form, Metro-North provided the DMV with the names, addresses,

dates of birth, license numbers, and license classes for the 107 employees.[4]  See id.

Metro-North had obtained this information from its employees by means of various

mandatory personnel forms, which are maintained in the employees' personnel files.

See Dft's 56(a)(1) Stmt. at ¶¶ 27-31.

The DMVs have never questioned Metro-North's entitlement to the information it

requests.  See Pltff's 56(a)(1) Stmt. at ¶ 9.  If a state DMV requires that Metro-North

complete a form as a condition of the information's release, Metro-North declares that it

is a "government agency," and is then provided the information as a matter of routine.[5]

---

[4]While the plaintiffs discuss generally the forms and processes necessary to obtain driving histories in New York and New Jersey, see Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment at 6, neither party has submitted any completed forms Metro-North actually provided to, or received from, the DMVs of New York, New Jersey, or any state other than Connecticut.  Because the parties have not provided the court with such documentation, the court does not know exactly what information was exchanged between Metro-North and these state DMVs.  Consequently, the court must assess the instant motions solely on the basis of the record before it, namely, Metro-North's transactions with the Connecticut DMV.

[5]As the Bownas Affidavit notes, the Form J-23 that Metro-North submitted to the Connecticut DMV in November 2007 did not specify a code indicating the purpose for which the driver's histories would be used.  See Bownas Affidavit at fn. 3; see also Exhibit F to Bownas Affidavit.  Bownas, however, states that

See id.  Metro-North's non-CDL employees have not given Metro-North consent to obtain or use their DMV records, nor does Metro-North possess any such consent from those individuals.  See id at ¶ 8.

Metro-North monitors the operator qualifications of its driving employees in an attempt to mitigate several significant risks, including, inter alia, violation of state motor vehicle laws, jeopardy to the safety of Metro-North employees and service users, and exposure of Metro-North to lawsuits.  See Dft's 56(a)(1) Stmt. at ¶ 13.  Metro-North also monitors its driving employees' driving histories to reduce its motor vehicle insurance premium rates.  See id. at ¶¶ 17-19.

## IV.    DISCUSSION

The plaintiffs' claim rests on Metro-North's alleged violation of the Driver's Privacy Protection Act, 18 U.S.C. § 2721, et seq.  The DPPA states:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter [18 U.S.C. §§ 2721 et seq.] shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

18 U.S.C. § 2724(a).  Thus, the court must determine whether there exists a genuine issue of material fact as to either necessary element of the cause of action, namely: 1) whether, in acquiring its employees' driving histories, Metro-North knowingly obtained or

---

when Metro-North does specify a code on Form J-23, it specifies "Code 1," which corresponds to the following: "[The information will be used] [b]y any federal, state or local government agency in carrying out its functions or any individual or entity acting on behalf of any such agency."  See id.  Although Metro-North did not specify this code on the November 2007 Form J-23, it wrote "No Fee" in the "Unit Price" section of the form.  Id.  A stamp on the top of the form indicates that the DMV processed the request at no charge to Metro-North.  Id.  It is Bownas' understanding, unchallenged by the plaintiff, that government agencies are entitled to copies of motor vehicle records at no charge.  See Bownas Affidavit at fn. 3.

used personal information from a motor vehicle record;[6] and if so, 2) whether it did so for a purpose permitted under the DPPA.  Because the court determines that there is no genuine issue of material fact regarding the first element, however, it need not reach the second.

A.    Metro-North's Acquisition and Use of Employees' Driving Histories

Plaintiffs have brought a civil action against Metro-North under 18 U.S.C. § 2724(a).  As noted above, in order to be liable to plaintiffs under section 2724(a), Metro-North must have "knowingly obtain[ed], disclose[d], or use[d] personal information from a motor vehicle record."  18 U.S.C.  § 2724(a).  Section 2725(3) of the same chapter defines "personal information" as:

> [I]nformation that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

18 U.S.C. § 2725(3).  The only motor vehicle records obtained by Metro-North, and therefore the only motor vehicle records at issue in this case, are employees' driving histories.[7]

In Connecticut, a driving history contains a list of the operator's traffic violations, as well as information pertaining to the status of the operator's license and registration.[8]

---

[6]Plaintiffs do not allege, and there is no evidence in the record, that Metro-North disclosed any of the information it obtained from state DMVs.

[7]Metro-North does not dispute that, under the DPPA, driving histories are motor vehicle records.

[8]The record contains no examples of driving histories obtained from the New York DMV, New Jersey DMV, or any state DMV other than Connecticut.  Consequently, the court has no information on the precise content of these histories, and must base its decision solely on the records from Connecticut.  See footnote 4, supra.

See Defendant's Affidavit of Marcella Muhammad, Acting Supervisor of Over the Counter Sales, Connecticut DMV ("Second Muhammad Affidavit") at ¶ 5.  The plain language of section 2753(3) makes clear that driving violations and driver's status are not personal information and therefore not protected by the DPPA.  See, e.g., IBEW Sys. Council No. 7 v. MTA Metro-North R.R., 2007 U.S. Dist. LEXIS 28492, *7 (D. Conn. Apr. 18, 2007) (holding that "on its face, the unambiguous language of the [DPPA] does not provide any protection for [traffic violations or information relating to the revocation, suspension, or violation of a driver's license]").  Consequently, Metro-North needed neither the consent of its employees nor a DPPA permissible use to obtain and use such information.

Connecticut driving histories do, however, contain information other than the driver's traffic violation and license status information.  For example, the driving history Metro-North obtained for named plaintiff Camara on November 27, 2007 from the Connecticut DMV includes Camara's name, birth date, driver's license number, and driver's license expiration date.  See Exhibit 2 to the Second Muhammad Affidavit. Under section 2725(3), Camara's name and driver's license number are protected personal information.[9]  Thus, the proper inquiry for the court is whether, under the DPPA, Metro-North knowingly obtained or used personal information from a motor

---

[9]Camara's birth date and driver's license expiration date are not protected.  In the definition of "personal information," section 2725(3) lists an individual's "photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information . . . ."  18 U.S.C. § 2725(3).  Applying the interpretive doctrine of expressio unius est exclusio alterius, the statute cannot be read to apply to an individual's birth date nor his driver's license expiration date.  See Frank G. v. Bd. of Educ., 459 F.3d 356, 370 (2d Cir. 2006) (holding that application of the doctrine of expressio unius "is proper where "the statute identifies a series of two or more terms or things that should be understood to go hand in hand, thus raising the inference that a similar unlisted term was deliberately excluded" ).

vehicle record when it acquired Camara's driving history.

As Metro-North repeatedly points out, in requesting the driving histories of Camara and its other employees, it provided the Connecticut DMV with the employees' names, addresses, birth dates, driver's license numbers, and license classes. See Exhibit 1 to the Second Muhammad Affidavit. Consequently, when the DMV sent Metro-North driving histories containing the employees' names and license numbers, it provided no personal information it had not received from Metro-North in Metro-North's original request.

Plaintiffs argue that Metro-North's prior possession of the personal information contained in the driver's histories – i.e., the employees' names and driver's license numbers – does not excuse it from complying with DPPA's mandate that personal information from a motor vehicle record be obtained or used only for a permitted purpose. Metro-North, on the other hand, contends that its prior possession of the personal information, together with the fact that it provided that very information to the Connecticut DMV in its records request for the sole purpose of obtaining publicly available information, removes it from the scope of the DPPA. Specifically, Metro-North argues that when someone provides a state DMV with personal information necessary to obtain unprotected, non-personal information (e.g., a record of an individual's traffic violations), receiving that same personal information back from the DMV on a driving history form does not trigger the protections of the DPPA. The court agrees.

In determining whether the DPPA applies to the instant facts, it is helpful to

examine the "broader context and primary purpose" of the statute.[10]  See Can. Life

Assur. Co. v. Converium Ruckversicherung (Deutschland) AG, 335 F.3d 52, 56 (2d Cir.

2003).  As the Second Circuit has noted, "[w]hen determining which reasonable

meaning [of a statute] should prevail, the text should be placed in the context of the

entire statutory structure."  Nat'l. Res. Def. Council v. Muszynski, 268 F.3d 91, 98 (2d

Cir. 2001).  Ultimately, "courts will construe the details of an act in conformity with its

dominating general purpose, will read text in the light of context and will interpret the

text so far as the meaning of the words fairly permits so as to carry out in particular

cases the generally expressed legislative policy."  SEC v. C. M. Joiner Leasing Corp.,

320 U.S. 344, 350-351 (1943).

The DPPA was enacted as part of the Violent Crime Control and Law

Enforcement Act of 1994.  See Violent Crime Control and Law Enforcement Act of

1994, Pub. L. No. 103-322, Tit. XXX, 108 Stat. 2099-2102, 18 U.S.C. § 2721, et seq.  It

was a response to reports of crimes committed by stalkers who obtained their victims'

home addresses from DMV records.[11]  See Margan v. Niles, 250 F. Supp. 2d 63, 68

(N.D.N.Y 2003) (reviewing the legislative history of the DPPA).  The record is clear that,

in passing the DPPA, Congress intended to protect the physical safety of an individual

---

[10]Courts turn to the traditional canons of statutory construction to resolve ambiguities in statutes. See United States v. Peterson, 394 F.3d 98, 105 (2d Cir. 2005).  Here, the outcome of the present inquiry depends on the court's construction of the terms "obtain or use" and "from a motor vehicle record," as employed in 18 U.S.C. § 2724(a).

[11]The immediate catalyst for the DPPA was the tragic murder of Rebecca Schaeffer in Los Angeles in 1989.  See 145 Cong. Rec. S14533-02 ("The murder of Rebecca Schaeffer led to the Driver's Privacy Protection Act").  Schaeffer was a 21-year-old actress who starred on a television show called My Sister Sam in the late 1980s.  See 139 Cong. Rec. S15745-01.  One of Schaeffer's "fans," Robert Bardo, retained a private investigator who recorded Schaeffer's license plate number.  The investigator then went to the California DMV, where he was able to obtain Schaeffer's home address.  With the knowledge of Schaeffer's address, Bardo went to her home and murdered her.  See id.

who entrusts her personal information to a state DMV, not a list of her traffic violations.[12]  <u>See id.</u>  This intent is reflected in the plain language of the statute.  <u>See</u>, <u>e.g.</u>, 18 U.S.C. § 2725(3) ("personal information means information that identifies an individual, . . . <u>but does not include information on vehicular accidents, driving violations, and driver's status</u>") (emphasis added).  The DPPA does not, in any way, restrict public access to information regarding an individual's vehicular accidents, driving violations, and driver's status.

In order to obtain such information in Connecticut, the requestor must provide the DMV with the driver's name, license number, address, and date of birth.  Second Muhammad Affidavit at ¶ 10.  If the requestor provides this identifying data, the DMV forwards the accident, violation, and license status information to the requestor in the form of a driver history.  As previously discussed, that driver history contains no personal information (as defined by 18 U.S.C. § 2725(3)) that the requestor did not first provide to the DMV in its request.

Further, there is no evidence in the record that Metro-North "used" the personal information from the driving histories (<u>i.e.</u>, the employees' names and driver's license numbers).  Rather, Metro-North used the non-personal, unprotected information it gleaned from the histories – <u>i.e.</u>, the operator's traffic violation and license status information – in managing its driving employees.

---

[12]While the commercial use of personal information from motor vehicle records was also a concern, "the DPPA was a crime fighting measure[,] not a general privacy protection measure."  <u>Margan v. Niles</u>, 250 F. Supp. 2d 63, 69 n.4 (N.D.N.Y 2003); <u>see also</u> <u>Condon v. Reno</u>, 155 F.3d 453, 456 (4th Cir. 1998) (noting that the DPPA was passed after Congress heard testimony that, "as many as 34 States allowed easy access to personal information contained in motor vehicle records and that criminals had used such information to locate victims and commit crimes"), rev'd, 528 U.S. 141 (2000) (reversing the Fourth Circuit's ruling that Congress did not have the authority to enact the DPPA).

-11-

The plaintiffs would have the court read the DPPA as requiring that driver histories be excised of all personal information unless the requestor has a DPPA permitted use.  Such a reading does not comport with the legislative history nor the plain language of the statute.  Congress explicitly allowed public access to information regarding an individual's vehicular accidents, driving violations, and driver's status.  If the DMV were to provide requestors with this information without any means of identifying the individual to whom the information pertains, the information would be unsuitable for any use but statistics.

This was not Congress' intent.  Congress intended to prevent crimes enabled by easy access to state-verified personal information.  See, e.g., 140 Cong. Rec. H2518-01 (statement of Rep. Goss) ("The intent of [the DPPA] is simple and straightforward: we want to stop stalkers from obtaining the name and address of their prey . . .").  Under Connecticut's current system, an individual who obtains another's driving history is no more able to engage in criminal activity of the type Congress meant to thwart than he was when he first requested the information.

Consequently, Metro-North's acquisition and use of its employees' driving histories – which contained no more "personal information" than Metro-North had submitted to the DMV in order to obtain those histories – cannot be considered obtaining or using personal information from a motor vehicle record, and thus does not implicate the protections of the DPPA.  As a result, plaintiffs lack a cause of action under section 2724(a), and Metro-North is entitled to summary judgment.

**V.     CONCLUSION**

Both Motions for Leave to File (Doc. Nos. 55 & 56) are **GRANTED**.  For the reasons discussed herein, Metro-North's Motion for Summary Judgment (Doc. No. 42) is likewise **GRANTED**.  Accordingly, plaintiff's Motion for Summary Judgment (Doc. No. 20) is **DENIED** as moot.  The Clerk is directed to enter judgment and close this case.  **SO ORDERED**.

Dated this 29th day of January, 2009, at Bridgeport, Connecticut.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge